Filed 10/9/25  In re J.J. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.J., a Person Coming Under the Juvenile Court Law. | B344967 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>B.J.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 21CCJP02437) |

APPEAL from an order of the Superior Court of Los Angeles County.  Jean M. Nelson, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

B.J. (Mother) appeals from the juvenile court's order terminating her parental rights at the permanency planning hearing. (Welf. & Inst. Code, § 366.26.) Mother contends she demonstrated the elements of the parental benefit exception (§ 366.26, subd. (c)(1)(B)(i)), and the juvenile court abused its discretion in choosing adoption as the permanent plan and freeing her infant son J.J. to be adopted.

We conclude mother has not shown the juvenile court abused its discretion and therefore affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In September 2023, the Los Angeles County Department of Children and Family Services (DCFS) detained one-month-old J.J. because Mother's substance abuse and mental illness interfered with her ability to care for J.J. and placed him at substantial risk of serious physical injury. (Welf. & Inst. Code, § 300, subds. (b) & (j).) At the time of his birth, J.J.'s older brother and sister were dependents of the juvenile court, having been detained from Mother in May 2021. In connection with that dependency proceeding, Mother had multiple positive tests for cocaine and/or marijuana in the weeks after J.J.'s birth. A referral was therefore made to DCFS regarding J.J.

In November 2024, while these proceedings were pending, the juvenile court terminated Mother's parental rights to J.J.'s brother and sister, and this court affirmed that order on appeal. (*In re E.M. et al.*, (Jun. 30, 2025, B342050) [nonpub.opn.].) Mother's parental rights were also terminated in 2016 to an older half sibling, who was adopted in 2019.

During the reunification period, Mother was mostly consistent with visitation and generally had positive interactions with J.J. However, Mother could not parent J.J. She did not

2

take direction well on J.J.'s needs as an infant.  In one instance, Mother was offered written materials describing appropriate food for babies 6 to 12 months old, but Mother rejected it saying she would continue to feed her children as she saw fit.  Mother also continued to have positive drug tests for marijuana and amphetamines.

The juvenile court terminated reunification services for Mother on September 23, 2024.

In the permanency planning report, DCFS reported that Mother had twice-weekly monitored visits with J.J. and that she was consistent with her visitation.  The visits generally went well, with Mother engaging in appropriate activities with J.J., praising him and showing him physical affection.  J.J. in turn showed excitement at seeing Mother during visits and often "cling[ed]" to her side.  They appeared to have an emotional bond.  However, Mother could also be moody, was not good at taking direction, and refused to provide age-appropriate food for J.J.  She would give him fast food and even chicken wings, letting him chew on the bones, despite his young age.  The caregivers raised concerns to the social worker that J.J. had diarrhea or constipation after visits with Mother because of the improper food she gave to him.

DCFS also reported ongoing concerns with Mother because she did not follow medical directions.  J.J. had some developmental delays and was a regional center client.  In addition, several months after his birth, J.J.'s doctors determined he needed to wear an infant helmet although he was cleared to stop wearing it in July 2024.  Despite being present "when the doctor explained the purpose and details behind the helmet,"

3

Mother routinely took the helmet off and downplayed its importance.

On one occasion, Mother failed to secure J.J. in his stroller, and he started to climb out of it. "HSA staff were able to catch [J.J.] before he hit the floor. Mother laughed about the incident." Just a month later, Mother again took off J.J.'s helmet and failed to secure him in the stroller. This time, J.J. fell to the floor. Mother became angry and tried to shift the blame onto the monitor for J.J.'s fall. The social worker also expressed concern that Mother arrived at some visits with an odor of marijuana and slapped J.J.'s sister in the face in his presence during a joint visitation.

DCFS reported J.J. was thriving in the home of his caregivers and prospective adoptive parents, Mr. and Mrs. F. J.J. was placed with the couple in September 2023, when he was just one month old. He was regularly observed showing affection, seeking attention and happily interacting with Mr. and Mrs. F., as well as his two siblings who DCFS placed in the couple's home. DCFS reported that Mr. and Mrs. F. had developed a "loving parent to child relationship" with J.J. and wanted to adopt him and maintain his sibling relationship with his brother and sister who they were in the process of adopting. DCFS emphasized that J.J. only lived with Mother for the first month of his life, and had only ever known Mr. and Mrs. F. as his caregivers. Mr. and Mrs. F. told the social worker they were willing to allow all three children to continue to have contact with Mother "as long as contact does not negatively affect the familial system."

DCFS recommended the juvenile court terminate parental rights for Mother and the unidentified father.

4

The permanency planning hearing was held on January 21, 2025. (Welf. & Inst. Code, § 366.26.)

Mother testified that J.J. expressed happiness to see her at their visits, was very talkative with her, called her "momma," and appeared to not want visits with her to end. Mother said it was difficult to not have more time with him, but even in their limited time together, she knew they had a bond because he is her child and she understands him. Counsel for Mother argued the Department admitted in the .26 report that J.J. often "clings" to Mother and appears to have a bond. Counsel said terminating the relationship would be detrimental and Mother should be allowed to remain a presence in J.J.'s life.

Counsel for J.J. acknowledged that Mother is someone he cares about and enjoys spending time with, but that the home he has with Mr. and Mrs. F. was the only home he had known, and Mother could not show the type of relationship that outweighed the benefits J.J. will obtain from being adopted.

Counsel for DCFS conceded that Mother had maintained regular visitation and had an emotional connection with J.J. But counsel emphasized that J.J. had medical and developmental issues that Mother routinely minimized. Counsel said the stability and security of being raised in an adoptive home with his siblings far outweighed any negative consequences from terminating his relationship with Mother.

The juvenile court acknowledged Mother's regular visitation with J.J. and the efforts she made to form a relationship with him. The minute order from the hearing erroneously states the court did not find Mother had made regular visitation, but the court stated otherwise on the record.

5

However, the court expressed concern about the negative aspects of Mother's visits with J.J. For instance, the court said that while J.J. no longer needed his medically prescribed helmet, Mother's difficulties with that issue during the reunification period showed she was "not able to put the child's medical needs over her own desires." The court explained Mother had not shown evidence demonstrating that J.J. would suffer detriment if their relationship was severed, nor evidence the positive aspects of their relationship outweighed the stability and benefits J.J. would receive from living in an adoptive home with his siblings. The court found Mother had not met her burden of establishing the parental benefit exception to adoption. The court found by clear and convincing evidence that J.J. was adoptable, terminated parental rights, and transferred custody to DCFS pending adoptive placement.

Mother filed a timely appeal.

## DISCUSSION

Where, as here, a dependency proceeding has reached the permanency planning hearing, "the question before the court is decidedly not whether the parent may resume custody of the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) Indeed, at this stage, reunification services have been terminated, and the court is tasked with selecting the permanent plan that best serves the child's interest. (*Ibid.*; see also Welf. & Inst. Code, § 366.26.)

Under the statutory scheme, adoption is the preferred permanent plan when a child is deemed likely to be adopted. As our Supreme Court has explained, "adoption is the norm." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) " 'Adoption is the Legislature's first choice because it gives the child the best

6

chance at [a full] emotional commitment from a responsible caretaker.' " (*Ibid*.) Once reunification efforts have failed, " 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid*.)

In asserting the parental benefit exception to adoption, it was Mother's burden to demonstrate, by a preponderance of the evidence, three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 629, 631.)

The Department conceded, and the juvenile court found, that Mother maintained regular visitation.

With respect to the second and third elements of the exception, Mother argues the court abused its discretion in finding J.J. would not suffer detriment if his relationship with her was severed. Mother says she raised J.J. for the first month of his life and maintained regular visitation during these proceedings, which has resulted in a strong emotional bond between them. Mother says a plan of legal guardianship would allow J.J. to have a stable home in the care of Mr. and Mrs. F. but would allow him the benefit of maintaining his relationship with Mother. We are not persuaded.

Our review of the court's findings on the second element of the exception are reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) As to the third element, we

review the court's order under the deferential abuse of discretion standard.  (*Id.* at p. 640.)

*Caden C.* instructs that the parental benefit exception is "limited in scope."  (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent."  (*Id.* at pp. 633–634.)  In assessing each element, the focus must always remain on the best interests of the dependent children.  (*Id.* at pp. 632–633.)  A parent's continued struggles with the issues that led to dependency are relevant to the extent they inform the court's assessment of whether the children would "benefit from continuing the relationship and be harmed, on balance, by losing it[.]"  (*Id.* at p. 638.)

The record here contains ample evidence supporting the juvenile court's factual findings, and its exercise of discretion. The court concluded that while J.J. enjoyed his time with Mother and had an emotional connection, their bond was not so substantial that it outweighed the benefits J.J. would obtain through adoption in the home of his caregivers with two of his siblings.  J.J. had never lived with Mother, with the exception of a brief period of approximately a month after his birth.  In addition, J.J.'s interactions with Mother, while positive, also consistently had negative features that could impact his physical and emotional development.  Nothing in the record supports a conclusion the juvenile court abused its discretion in finding that Mother had failed to establish the parental benefit exception. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53 [statutory exceptions

8

apply in "*exceptional circumstances*" to permit a juvenile court to choose a permanent plan other than adoption].)

**DISPOSITION**

The juvenile court's order terminating Mother's parental rights to J.J. is affirmed.


VIRAMONTES, J.


WE CONCUR:



WILEY, Acting P. J.



RUBIN, J.*

---

\*      Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.